**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | | |
|---|---|---|
| **JOHN DOE,** | **:** | |
| | **:** | |
| **Plaintiff,** | **:** | |
| | **:** | |
| **vs.** | **:** | **5:04-CV-173 (DF)** |
| | **:** | |
| **GENE A. SCROGGY, Warden, et al.,** | **:** | |
| | **:** | |
| **Defendants.** | **:** | |

**O R D E R**

## I.   INTRODUCTION

On June 3, 2004, John Doe ("Plaintiff"), Charles Doe, and James Doe, all former

inmates at Frank C. Scott, Jr. State Prison[1] ("Scott Prison"), instituted separate § 1983

actions[2] against nine Georgia Department of Corrections ("GDOC") officials in their

individual and official capacities: (1) Gene Scroggy, Warden of Scott Prison; (2) Aubrey

Jones, Deputy Warden of Security for Scott Prison; (3) Tom McElhenney, Deputy Warden

---

[1]  Scott Prison is located in Hardwick, Georgia.

[2]  *See* civil action numbers 5:04-cv-171 (DF) and 5:04-cv-172 (DF).

1

of Care and Treatment for Scott Prison; (4) Gloria Nicholson (n/k/a Gloria Chester),[3] a supervisory correctional officer at Scott Prison; (5) Captain Carl Evans, a supervisory correctional officer at Scott Prison; (6) Sergeant Dennis Holsey, a supervisory correctional officer at Scott Prison; (7) Sergeant Dennis Knight, a supervisory correctional officer at Scott Prison; (8) Ray Stanelle, an investigator in the GDOC's Internal Investigations Division; and (9) Johnny McCurry, Director of the Internal Investigations Division ("Defendants"). In the instant action, Plaintiff charges Defendants with violations of the Eighth Amendment to the United States Constitution, made applicable to the States through the Fourteenth Amendment, and enforced through 42 U.S.C.A. § 1983 (West 2005).

Before this Court is Defendants' Motion for Summary Judgment (doc. 37). For the reasons stated below, Defendants' summary-judgment motion is **GRANTED**.

## II.   STANDARD OF REVIEW

The summary-judgment rule exists "to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Summary judgment must be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue

---

[3] While Gloria Chester is a named defendant in this action, Plaintiff does not allege that Chester personally violated any of his constitutional rights. (*See* Pl.'s Resp. Defs.' Mot. Summ. J., doc. 76, at 48.) Accordingly, Defendants' summary-judgment motion with respect to Defendant Chester is **GRANTED**.

as to any material fact and . . . the moving party is entitled to a judgment as a matter of

law." Fed. R. Civ. P. 56(c) (West 2005); *see also* ***Celotex Corp.***, 477 U.S. at 322. A genuine

issue of material fact necessary to defeat a properly supported motion for summary

judgment arises only when "the evidence is such that a reasonable jury could return a

verdict for the nonmoving party." ***Anderson v. Liberty Lobby, Inc.***, 477 U.S. 242, 248

(1986). In reviewing a motion for summary judgment, a court must review all the evidence

in the record while "draw[ing] all reasonable inferences in favor of the nonmoving party,

and it may not make credibility determinations or weigh the evidence." ***Reeves v.***

***Sanderson Plumbing Prods., Inc.***, 530 U.S. 133, 150 (2000); *see also* ***Maynard v. Williams***,

72 F.3d 848, 851 (11th Cir. 1996).

The moving party "always bears the initial responsibility of informing the district

court of the basis for its motion, and identifying those portions of the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits,

if any, which it believes demonstrate the absence of a genuine issue of material fact" and

entitle it to a judgment as a matter of law. ***Celotex Corp.***, 477 U.S. at 323 (internal quotation

marks omitted). If the moving party discharges this burden, the burden shifts to the

nonmoving party to go beyond the pleadings and present specific evidence showing that

there is a genuine issue of material fact (i.e., evidence that would support a jury verdict)

3

or that the moving party is not entitled to a judgment as a matter of law.  *See* Fed. R. Civ.

P. 56(e); ***Celotex Corp.***, 477 U.S. at 324-26.  This evidence must consist of more than mere

conclusory allegations or legal conclusions.  *See **Avirgan v. Hull***, 932 F.2d 1572, 1577 (11th

Cir. 1991).  Under this scheme, summary judgment must be entered "against a party who

fails to make a showing sufficient to establish the existence of an element essential to that

party's case, and on which that party will bear the burden of proof at trial." ***Celotex Corp.***,

477 U.S. at 322.

## III.   FACTUAL BACKGROUND

In 1984, a group of inmates sued the GDOC, challenging "a broad spectrum of

unconstitutional conduct" by the GDOC and its employees. (Pl.'s Resp. Defs.' Mot. Summ.

J., doc. 76, at 3; *see **Cason v. Seckinger***, Civil Action No. 5:84-CV-313-1 (M.D. Ga. 1984)).

The action was largely resolved through a series of consent orders[4] aimed at curing the

alleged "constitutional deficiencies."  (Pl.'s Resp. 3.)  Pursuant to the consent decrees, the

GDOC adopted certain standard operating procedures (SOPs) designed to address and

remedy the perceived deficiencies.  In particular, the GDOC implemented several SOPs

outlining the procedures for employees to follow when confronted with an inmate's

---

[4] The consent decrees were entered between May 10, 1990, and March 29, 1996.  *See **Cason v. Seckinger***, 231 F.3d 777, 778 (11th Cir. 2000).

4

allegation of sexual abuse, assault, or misconduct by another inmate or a staff member.  For example, SOP IK01-0007 requires staff members who learn of an incident of sexual abuse, assault or misconduct to immediately notify the warden or the institutional duty officer, or both.  (Pl.'s Dep., Ex. 5.)  The warden then must notify the applicable regional or divisional director.  (Id.)  SOP IK01-0007 also requires the warden to "ensure that mental health and medical assistance are immediately made available for the victim, including assistance which may be necessary throughout the course of the investigation."  (Id.)

SOP VH85-0002 requires health care staff members to report sexual contact or abuse to the warden, and outlines the procedures to be followed upon learning of a sexual-abuse allegation.  (Pl.'s Dep., Ex. 6.)  In turn, prison officials are required to notify a health care staff member when an inmate makes a sexual-assault allegation, and it is the staff member's responsibility to make arrangements for the inmate to undergo a medical evaluation.  (Id.)  Lastly, SOP VG01-0014 requires inmates who are suspected victims of sexual assault or abuse to receive a mental-health evaluation and be referred for treatment, if necessary.  (Pl.'s Dep., Ex. 7.)  This SOP also requires any employee who becomes aware that an inmate has been sexually assaulted to notify the warden, the mental-health manager and appropriate medical authorities.  (Id.)  The *Cason* litigation ended in February 2002, but the SOPs implemented as a result of that litigation remain in place

5

within the GDOC's correctional facilities.

With this background in mind, the Court turns to the factual allegations that are the basis of this suit.[5]  The constitutional violations alleged by Plaintiff arise out of a series of sexual assaults committed against him by a correctional officer named Nicholas Tuft ("Tuft"), who was employed at Scott Prison during Plaintiff's incarceration at that facility.[6] According to Plaintiff, Tuft sexually assaulted him on three different occasions between June 2002 and July 2002.

Plaintiff claims Tuft's first sexual assault occurred on or around June 15, 2002, after 9:00 p.m.  That night, Tuft instructed Plaintiff to sweep the back porch of the Holly Building, dormitory E ("Holly E Hall").  Plaintiff obeyed.  Tuft joined Plaintiff on the back porch shortly thereafter, and led Plaintiff to an out-of-sight corner of the porch where he forced Plaintiff to receive, and then to give, oral sex.  The assault abruptly ended when Tuft responded to a radio call.

---

[5]  The essential facts of this case are not in dispute.  Even if the facts were disputed, this Court would still be under an obligation to  take the facts in the light most favorable to Plaintiff both because this case is before the Court on Defendants' summary-judgment motion, *Reeves*, 530 U.S. at 150, and because Defendants have asserted qualified immunity.  *Robinson v. Arrugueta*, 415 F.3d 1252, 1257 (11th Cir. 2005) ("[M]aterial issues of disputed fact are not a factor in the court's analysis of qualified immunity and cannot foreclose the grant or denial of summary judgment.") The Court notes, however, that Defendants have "reserve[d] the right to contest Plaintiff's testimony in the event some or all of Plaintiff's claims survive summary judgment."  (Defs.' Br. Supp. Mot. Summ. J., doc. 34, Attach. 2, at 1 n.1.)

[6] Although Tuft was originally a named defendant in this action, the parties stipulated to his dismissal on May 4, 2005.

The second sexual assault occurred about a week and a half later.  Plaintiff was walking up a set of stairs in a hallway leading from the kitchen to Holly E Hall when Tuft stopped him.  The two engaged in a conversation during which Tuft asked Plaintiff to engage in anal sex.  When Plaintiff refused, Tuft performed oral sex again on Plaintiff.  This encounter, too, was interrupted by a radio call.

Tuft's final assault on Plaintiff took place in the prison's gymnasium about two weeks after the second assault.  That day, Tuft was working in the gymnasium during the inmates' recreational time.  Just before recreational time ended, Tuft took Plaintiff aside in front of the other inmates, handcuffed him, and said he was going to lock Plaintiff up. Tuft then ushered the other inmates out, forcing Plaintiff to remain behind. When Tuft returned to the gymnasium, he locked the door, and  began pulling down Plaintiff's pants while Plaintiff was standing up.  Plaintiff resisted Tuft's efforts and fell down, face first.  After unsuccessfully attempting to have sex with Plaintiff, Tuft masturbated, leaving his semen on Plaintiff's back.  Then, Tuft wiped the semen up, took Plaintiff's handcuffs off, and told Plaintiff to sweep the gym floor.  After Plaintiff swept the floor, Tuft unlocked the gym door and allowed Plaintiff to return to his dormitory.

On July 10, 2002, around 9:00 p.m., Plaintiff walked down the hallway of Holly E Hall to get ice.  As Plaintiff attempted to enter the room where the ice machine was located,

Tuft blocked the entrance.  After bumping into Tuft, Plaintiff pushed him out of the way.

Tuft reported Plaintiff's assault, and Plaintiff was escorted to Security.  Once there, Plaintiff

informed Sergeant Knight and the other correctional officers  present about Tuft's sexual

assaults.  This was the first time any prison official had been notified about the assaults.

After Plaintiff was briefly detained in Security, he was placed in administrative segregation

around 9:50 p.m.  He was not given a mental-health evaluation, nor was he referred for any

other psychiatric treatment at that time.

On July 11, 2002, Plaintiff filled out a witness statement wherein he alleged Tuft said

he "wanted to suck my dick," and that he let Tuft do so on the back porch of Holly E Hall,

in exchange for which Tuft gave him "a box of black and mild and a lighter."  (Pl.'s Dep.

Ex. 17.)  Plaintiff claims that he did not outline all of Tuft's assaults in his statement

because he wanted his allegations to remain confidential.  So, he "just wrote what [he] felt

would get their attention, that would get somebody to come speak with [him] about the

situation." (Pl. Dep. 123.)  The same day, Deputy Warden Aubrey Jones and Captain Carl

Evans questioned Plaintiff about his allegations.  Tuft responded to Plaintiff's allegations

by filing a witness statement denying any sexual involvement with Plaintiff.  (Pl.'s Dep.

Ex. 17.)  At 5:45 p.m. on July 11th, while he was still in administrative segregation, Plaintiff

intentionally cut himself.  When he was discovered, he was escorted to the medical

8

department for treatment, and was examined by Counselor Michael Avant.  Avant was not informed that Plaintiff was a potential victim of sexual assault.  Based on Avant's observations, Plaintiff was sent to Baldwin State Prison's Crisis Stabilization Unit.

Notwithstanding Tuft's denial of Plaintiff's allegations, Deputy Warden Jones referred the matter to Warden Gene Scroggy on July 12, 2002.  Scroggy referred the matter to Regional Director Jimmy Sikes on the same day.  With the exception of the notification he provided to Sikes, Scroggy apparently took no other action with respect to Plaintiff's allegations: he did not refer Plaintiff for medical or mental-health treatment, nor did he limit or prohibit Tuft's interaction with the general inmate population.

On Tuesday, July 16, 2002, Plaintiff returned to administrative segregation in Scott Prison, where he again cut himself.  Following this episode, Sergeant Leonard Smiley took Plaintiff to the medical department for treatment.  Plaintiff was then transferred to Valdosta State Prison's Crisis Stabilization Unit, where he remained until July 20, 2002.

On July 17, 2002, Sikes forwarded Plaintiff's allegations to Johnny McCurry, Director of Internal Investigations for the GDOC for further review.  On July 30, 2002, the Tuft investigation was assigned to Investigator Ray Stanelle.[7]  Stanelle did not take any affirmative action on the matter until August 12, 2002.  On that date, Stanelle received

---

[7] Stanelle was not specially trained to investigate allegations of sexual assault.  (Pl.'s Resp. 17.)

word that another inmate, Charles Doe, had accused Tuft of sexual assault and had provided the GDOC with semen-stained clothing.  Around the same time, James Doe, yet another inmate at Scott Prison, had also accused Tuft of sexual assault.

Plaintiff returned to administrative segregation in Scott Prison on July 20, 2002. Once there, Plaintiff opened the wounds on his arm by scratching them with his fingernails.  Lieutenant Chris Thomas brought Plaintiff to the medical department, but Plaintiff apparently refused treatment.  Plaintiff was subsequently transferred to Rutledge State Prison in Columbus, Georgia.

Sometime between July 10, 2002, and July 31, 2002, Tuft was transferred to Holly A Hall.  In August 2002, following Charles Doe's and James Doe's sexual-assault allegations, Tuft was transferred to Men's State Prison ("MSP") in Hardwick, Georgia.  Stanelle interviewed Tuft at MSP on August 16, 2002.  Tuft denied Plaintiff's, Charles Doe's, and James Doe's allegations.  Tuft also declined to undergo a DNA test, choosing instead to tender his resignation.  On August 19, 2002, Scroggy recommended that Tuft not be eligible for rehire by the Department of Corrections.

On August 12, 2002, Stanelle interviewed Charles Doe concerning his allegation that Tuft sexually assaulted him on the back porch of the Holly Building on August 2, 2002.  On August 16, 2002, Stanelle interviewed James Doe concerning his allegation that Tuft

10

sexually assaulted him on July 30, 2002, and August 1, 2002.  Stanelle interviewed Plaintiff concerning his sexual-assault allegations on September 3, 2002.  Stanelle completed his investigation on September 9, 2002.  On September 16, 2002, Stanelle submitted his investigative report on Plaintiff's allegations.

Before formally closing its investigation into the inmates' allegations, the Internal Investigations Division referred its findings to the District Attorney's Office of Baldwin County, Georgia.  Following an investigation by the Georgia Bureau of Investigation, Tuft was arrested on April 25, 2003.  On November 19, 2003, Tuft was indicted by a Baldwin County grand jury on three charges of sexual assault against a person in custody, in violation of O.C.G.A. § 16-6-5.1.  Tuft subsequently pleaded guilty to all three counts of sexual assault.

## IV.   LEGAL DISCUSSION

### A. Official-Capacity Claims Under Section 1983

Each of the Defendants named in this action has been sued in his or her official capacity.  It is undisputed that all of the Defendants are (or were at the time of the events giving rise to Plaintiff's claims) employees of the State of Georgia.  It is also clear that the official-capacity claims against each Defendant are actually claims against the State of Georgia, and that the State of Georgia is the real party in interest.  *See **Will v. Mich. Dep't***

11

*of State Police*, 491 U.S. 58, 71 (1989) ("A suit against a state official in his or her official capacity is . . . a suit against the official's office . . . [and] is no different from a suit against the State itself.").

Section 1983 creates a cause of action against a *person* who, under color of law, deprives another person of his or her rights, privileges, or immunities secured by the Constitution or other federal statute.  42 U.S.C. § 1983 (emphasis added).  The Supreme Court has held that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983;" thus, neither a State nor a state official sued in his or her official capacity may be held liable in an action for damages brought pursuant to that section. *Will*, 491 U.S. at 71.

Accordingly, because Plaintiff's official-capacity claims against Defendants are barred, Defendants' summary-judgment motion with respect to Plaintiff's official-capacity claims is hereby **GRANTED**.

## B. Individual-Capacity Claims: Section 1983 and Qualified Immunity

Plaintiff charges Defendants individually with violations of the Eighth Amendment to the United States Constitution, made applicable to the States through the Fourteenth Amendment, and enforced through 42 U.S.C.A. § 1983 (West 2005).  Defendants argue that they are entitled to qualified immunity from Plaintiff's claims.  Based on the relevant facts

12

and the law in existence at the time of Defendants' alleged wrongful conduct, the Court finds that Defendants are entitled to qualified immunity.

"To prevail in a civil rights action under 42 U.S.C. § 1983, a plaintiff must show that the defendant, under color of state law, deprived the plaintiff of a right secured by the Constitution and laws of the United States." *Barfield v. Brierton*, 883 F.2d 923, 934 (11th Cir. 1989). "Section 1983 alone creates no substantive rights; rather it provides a remedy for deprivations of rights established elsewhere in the Constitution or federal laws." *Id.* "An underlying constitutional right must exist before a § 1983 action will lie." *Id.*

Although § 1983 creates a cause of action against state actors, a state actor acting within the scope of his or her official duties at the time of the alleged constitutional violation nonetheless may be entitled to qualified immunity from such actions. Qualified immunity shields government officials performing discretionary functions from liability for civil damages unless the performance of such functions violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *McElligott v. Foley*, 182 F.3d 1248, 1260 (11th Cir. 1999) (citations and quotations omitted).

To be eligible for the protection of qualified immunity, a state official must prove that he was performing a discretionary function "when the allegedly wrongful act occurred." *Rich v. Dollar*, 841 F.2d 1558, 1563 (11th Cir. 1988). If the official satisfies this

threshold inquiry, the burden shifts to the plaintiff to demonstrate "that the defendant public official's actions 'violated clearly established constitutional law.'" *Id.* (quoting *Zeigler v. Jackson*, 716 F.2d 847, 849 (11th Cir. 1983)).

Once the official satisfies his initial burden, courts employ a two-step analysis to determine whether or not the official is entitled to qualified immunity. The first inquiry is whether the official violated a constitutional right.  If a constitutional violation is found, the court will then determine whether the constitutional right was clearly established at the time of the violation.  *Crosby v. Monroe County*, 394 F.3d 1328, 1332 (11th Cir. 2004).

### 1. Discretionary Authority

A defendant's actions are deemed to be within the scope of his or her discretionary authority if "objective circumstances . . . compel the conclusion that his actions were undertaken pursuant to the performance of his duties and within the scope of his authority."  *Rich*, 841 F.2d at 1564 (internal quotation marks omitted).

It is undisputed that Defendants were exercising their discretionary authority as prison officials when the wrongful conduct giving rise to Plaintiff's claims arose.  Thus, Defendants are entitled to seek the protection of qualified immunity.  To overcome Defendants' assertions of qualified immunity,  Plaintiff must show that Defendants' conduct violated his clearly established constitutional rights.

14

**2. Qualified Immunity**

**(a) Has Plaintiff Alleged a Constitutional Violation?**

Plaintiff argues that Defendants' failure to refer Plaintiff for a mental-health evaluation and clinical treatment upon learning of his sexual-assault allegations clearly violated their supervisory duties outlined in Standard Operating Procedure VG01-0014. According to Plaintiff, Defendants' collective failure to comply with this SOP amounted to cruel and unusual punishment, in violation of the Eighth Amendment. Thus, the relevant issue here is whether, at the time of the alleged assaults, Plaintiff had a right under the Eighth Amendment to a mental-health evaluation and clinical treatment immediately following his unsubstantiated sexual-abuse allegations.

"Prisoners are guaranteed the right under the Eighth Amendment to be free from deliberate indifference by correctional institutions to their serious physical or psychological needs." *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991). "Deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 182-83 (1976)). However, not "every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." *Estelle*, 429 U.S. at 105. "[T]o state a cognizable claim, a prisoner

15

must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.  It is only such indifference that can offend evolving standards of decency in violation of the Eighth Amendment." *Id.*

"To show that a prison official acted with deliberate indifference to serious medical needs, a plaintiff must satisfy both an objective and subjective inquiry." *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003).  First, the plaintiff must demonstrate "an objectively serious medical need." *Id.* (citation omitted).  "In this circuit, it is established that psychiatric needs can constitute serious medical needs and that the quality of psychiatric care one receives can be so substantial a deviation from accepted standards as to evidence deliberate indifference to those serious psychiatric needs." *Steele v. Shah*, 87 F.3d 1266, 1269 (11th Cir. 1996).  Second, the plaintiff must prove that the prison official(s) acted with deliberate indifference to that need. *Id.* (citations omitted).  To establish a prison official's deliberate indifference, a plaintiff must demonstrate three elements with respect to the official: (1) subjective knowledge of a substantial risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence. *McElligott*, 182 F.3d at 1255.

**(i) Did Plaintiff Have an Objectively Serious Medical Need?**

Plaintiff claims that his sexual assault and the attending psychological consequences of the assault constituted an objectively serious medical need that warranted immediate

psychiatric attention.  Defendants do not challenge this contention.

For purposes of a deliberate-indifference inquiry, the term "serious medical need" applies to medical needs that are both physical and mental.  *Harris*, 941 F.2d at 1505 (citations omitted).  Sexual assault is clearly a serious injury.  Even when a victim of sexual assault does not suffer any physical injury, there is no question that a sexual assault can have a devastating psychological impact on the victim if the victim is not afforded proper psychiatric treatment.  *(See* Meck Dep. 52-53.)  Accordingly, the Court finds that the sexual assaults alleged by Plaintiff created an objectively serious psychological need.  The Court now turns to the subjective element of the deliberate-indifference inquiry.

### (ii) Were Defendants Deliberately Indifferent to Plaintiff's Psychological Needs?

Plaintiff must now demonstrate that Defendants acted with deliberate indifference to his serious medical need once they were informed of his assault allegation.  To accomplish this, Plaintiff must sufficiently show: (1) Defendants had subjective knowledge of a substantial risk of serious harm; (2) Defendants disregarded that risk; (3) by conduct that was more than mere negligence.

Plaintiff points to Defendants' violation of *Cason* SOP VG01-0014 (requiring, among other things, that prisoners alleging sexual assault be afforded a mental health evaluation and adequate psychiatric treatment) as conclusive proof of Defendants' deliberate

17

indifference.   In this Court's view, however, an SOP violation, while relevant to the deliberate-indifference inquiry, does not automatically result in a finding that Defendants also violated the Eighth Amendment.

"A consent decree . . . which arises out of a voluntary settlement and is not based on a finding of—and is not expressly intended to remedy a—violation of the Constitution cannot create or expand constitutional rights." *Cagle v. Sutherford*, 334 F.3d 980, 986 (11th Cir. 2003) (citations omitted).  "Such orders often place requirements on litigants that go beyond the minimum requirements of the Constitution." *Id.* at 987.  "Because the orders cannot create or expand constitutional rights, a § 1983 claim cannot be based solely on a violation of the [consent] order." *Id.*

The *Cason* SOPs were implemented pursuant to a series of consent orders designed to address a number of alleged constitutional violations by the GDOC and its employees. The *Cason* orders made no findings that the conditions of Scott Prison—or any other prison—were unconstitutional, or that the orders were necessary to prevent constitutional violations from occurring at Scott Prison.  Aside from Defendants' violation of SOP VG01-0014, Plaintiff offers no other evidence indicating that Defendants' failure to provide such treatment to Plaintiff was done knowingly and with the intent to subject Plaintiff to a substantial risk of serious harm.  Thus, the Court cannot say that Defendants' collective

18

failure to comply with this SOP, alone, constituted deliberate indifference. Defendants'
failure to afford Plaintiff psychiatric treatment may have amounted to negligence, but it
did not rise to the level of deliberate indifference.

In light of the foregoing, the Court concludes that, although a prison official's strict
adherence to all SOPs in every situation is desirable, the imperfect enforcement of a SOP,
in the absence of other evidence demonstrating an official's subjective knowledge and
intent to subject an inmate to a substantial risk of serious harm, does not satisfy the
subjective element required for a finding of deliberate indifference. *See Cagle*, 334 F.3d at
987; *Taylor v. Adams*, 221 F.3d 1254 (11th Cir. 2000); *Franklin v. Dist. of Columbia*, 163
F.3d 625, 636 (D.C. Cir. 1998).

Moreover, the fact that certain Defendants, instead of referring Plaintiff for mental
health treatment upon learning of his sexual-assault allegations, "threw John Doe in the
'hole'," does not change the Court's analysis. (Pl.'s Resp. 8.) "Discipline by prison officials
in response to a wide range of misconduct falls within the expected perimeters of the
sentence imposed by a court of law." *Sandin v. Conner*, 515 U.S. 472, 485 (1995). The
Eleventh Circuit has upheld the placement of an inmate accused of assaulting a
correctional officer in administrative segregation as a constitutionally permissible form of
discipline. *See Rodgers v. Singletary*, 142 F.3d 1252, 1253 (11th Cir. 1998) (inmate held in

administrative confinement for two months pending resolution of criminal charges arising from alleged altercation with correctional officer was not deprived of liberty interest under Fourteenth Amendment).

Thus, the Constitution did not prohibit Defendants from placing Plaintiff in administrative segregation when confronted with Tuft's physical-assault claim and Plaintiff's near-simultaneous claims of sexual assault.  For these reasons, then, the Court concludes that Plaintiff has not alleged a constitutional violation.  Ordinarily, this conclusion would end the Court's qualified-immunity analysis.  The Court will continue this analysis, however, in order to address Plaintiff's argument that his "right" to psychiatric treatment was clearly established when he reported Tuft's sexual assaults.

**(b) Assuming Plaintiff Had a Constitutional Right to Psychiatric Treatment Once He Reported Tuft's Sexual Assaults, Was This Right Clearly Established?**

As noted above, Plaintiff contends that he had an Eighth Amendment right to psychiatric treatment once he reported Tuft's sexual assaults, and that SOP VG01-0014 clearly reflected this right.  Plaintiff further contends that the relevant law and SOP VG01-0014 clearly established that Defendants, upon receiving notice of Plaintiff's sexual-assault allegations, had a duty to ensure that Plaintiff, the alleged victim, received proper mental-health treatment.  Even if this Court were to determine that Plaintiff had an Eighth

20

Amendment right to a mental-health evaluation and psychiatric treatment following his

allegations of sexual abuse, and that Defendants were deliberately indifferent to Plaintiff's

right, the Court still could not conclude that this right was clearly established at the time

the assaults occurred.

A constitutional right is "clearly established" if "'[t]he contours of the right are

sufficiently clear that a reasonable official would understand that what he is doing violates

that right.'" *McElligott*, 182 F.3d at 1260 (quoting *United States v. Lanier*, 520 U.S. 259, 270

(1997)). "This is not to say that an official action is protected by qualified immunity unless

the very action in question has been held unlawful; but it is to say that in the light of

preexisting law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635,

640 (1987). Additionally, "[a] consent decree . . . which arises out of a voluntary settlement

and is not based on a finding of—and is not expressly intended to remedy a—violation of

the Constitution" cannot "clearly establish that a violation of the consent order results in

a constitutional deprivation." *Cagle*, 334 F.3d at 986-87 (internal quotation marks omitted).

Although the Eleventh Circuit has recognized that inmates have a constitutional

right to adequate psychiatric care, *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989),

the Court's research has not revealed a single case in which the Supreme Court, Eleventh

Circuit, or the Supreme Court of Georgia held that the Eighth Amendment guarantees a

21

prisoner the right to a mental-health evaluation and psychiatric treatment immediately following an unsubstantiated allegation of sexual abuse.  While the absence of precedent establishing the alleged violation as unconstitutional does not bar this Court from finding that a constitutional right was clearly established, the Court cannot conclude that, in light of preexisting law dealing with a prisoner's right to psychiatric care, a reasonable prison official would recognize that an unsubstantiated sexual-abuse allegation carries with it an Eighth Amendment right to a mental-health evaluation or psychiatric treatment or both. *Cf.* ***Greason v. Kemp***, 891 F.3d 829, 834-36 (11th Cir. 1990) (recognizing inadequate psychiatric care could violate inmate's Eighth Amendment rights where director discontinued inmate's anti-depression medication despite information in inmate's clinical file which indicated inmate was suicide risk if not on anti-depressant medication); ***Waldrop***, 871 F.2d at 1036 (psychiatrist's abrupt discontinuation of inmate's psychotropic medication despite evidence of inmate's history of psychiatric illnesses could constitute deliberate indifference); ***Steele***, 87 F.3d at 1269 (same).

Eleventh Circuit precedent also requires this Court to reject Plaintiff's argument that SOP VG01-0014, by itself, clearly established an inmate's Eighth Amendment right to a mental-health evaluation and psychiatric treatment following a sexual-assault allegation.  *See* ***Cagle***, 334 F.3d at 987.  The *Cason* orders and the SOPs implemented pursuant to those

orders did not create or expand Plaintiff's Eighth Amendment rights.  Thus, the Court's

determination of whether a prisoner's right to psychiatric treatment was clearly established

at the time Plaintiff was assaulted is confined to an examination of Eighth Amendment

principles and case law in existence at the time of the alleged constitutional deprivations.

As previously noted, the Court's research has not revealed any case which would

have put Defendants on notice that their failure to order a mental-health evaluation and

psychiatric treatment for Plaintiff upon being notified of his sexual-assault allegations

would subject them to individual liability under the Eighth Amendment and 42 U.S.C.A.

§ 1983.  Nor is this Court of the opinion that, in the light of the paucity of decisional law

from this Circuit addressing an inmate's general right to psychiatric treatment, the

unlawfulness of Defendants' failure to obtain such treatment for Plaintiff following his

then-unsubstantiated allegations was apparent at the time Defendants were informed of

the alleged assaults.

Accordingly, because Plaintiff did not have a right to mental-health treatment

immediately following an unsubstantiated sexual-abuse allegation under the Eighth

Amendment, and because, even if such a right existed, it was not clearly established at the

time of Defendants' alleged Eighth Amendment violations, the Court hereby finds that

Defendants are entitled to qualified immunity from, and summary judgment on, Plaintiff's

suit.

## V.    CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment (doc. 37) is hereby **GRANTED**.  In so holding, the Court is not unmindful that its ruling may leave Plaintiff without effective legal redress for his injuries.  Yet, it is the Court's duty to apply the law as it existed at the time of Plaintiff's injuries.  Unfortunately for Plaintiff, the law does not afford him an avenue of relief against these Defendants.  The fact that Defendants are not *legally* culpable for their conduct in this case does not render them wholly blameless, however.  The Court strongly feels that the imposition of a prison sentence should not subject an inmate to the prurient predilections of corrections employees.  *See Boxer X v. Harris*, 437 F.3d 1107, 1111 (11th Cir. 2006) ("'[S]exual abuse of a prisoner by a corrections officer has no legitimate penalogical purpose, and is simply not part of the penalty that criminal offenders pay for their offenses against society.'" ) (quoting *Boddie v. Schnieder*, 105 F.3d 857, 861 (2d Cir. 1997)).

While the Court understands that "[r]unning a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government," *Turner v. Safley*, 482 U.S. 78, 84-85 (1987), the Court is still outraged that,

24

in spite of the *Cason* litigation and the many steps taken by the GDOC to prevent sexual assaults and to treat assault victims, Defendants did not fully comply with the SOPs implemented to address the exact situation faced by Plaintiff in this case.  If sexual-assault allegations by inmates against officers are as rare as Defendants claim them to be, the Court is baffled as to why Defendants did not take Plaintiff's allegation more seriously. Finally, although this Court must defer to the discretion of state prison authorities in cases like these, the Court nonetheless urges Defendants and all GDOC employees to strive harder to respond appropriately and promptly to any future allegations of sexual assault.

SO ORDERED, this 23rd day of October, 2006.

**/s/ Duross Fitzpatrick**
DUROSS FITZPATRICK, JUDGE
UNITED STATES DISTRICT COURT

DF/jab

25